UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| NATHAN PANTAGES GOMEZ, | Case No.: 17-cv-01582-MMA (RNB) |
| Plaintiff, | |
| v. | **REPORT AND RECOMMENDATION REGARDING CROSS-MOTIONS FOR SUMMARY JUDGMENT** |
| NANCY A. BERRYHILL, Acting Commissioner of Social Security,[1] | |
| Defendant. | **(ECF Nos. 10, 11)** |

This Report and Recommendation is submitted to the Honorable Michael M. Anello, United States District Judge, pursuant to 28 U.S.C. § 636(b)(1) and Civil Local Rule 72.1(c) of the United States District Court for the Southern District of California.

On October 20, 2016, plaintiff Nathan Pantages Gomez filed a Complaint pursuant to 42 U.S.C. § 405(g) seeking judicial review of a decision by the Commissioner of Social Security denying his applications for a period of disability and disability insurance benefits and for Supplemental Security Income ("SSI"). (ECF No. 1.)

---

[1]    Plaintiff did not name a specific Commissioner in his Complaint. Accordingly, Nancy A. Berryhill is hereby substituted as the defendant in this case per Fed. R. Civ. P. 25(d).

1

Now pending before the Court and ready for decision are the parties' cross-motions for summary judgment. (ECF Nos. 10, 11.) For the reasons set forth herein, the Court **RECOMMENDS** that plaintiff's motion for summary judgment be **GRANTED**, that the Commissioner's cross-motion for summary judgment be **DENIED**, and that Judgment be entered reversing the decision of the Commissioner and remanding this matter for further administrative proceedings.

## PROCEDURAL BACKGROUND

On December 19, 2013, plaintiff filed an application for a period of disability and disability insurance benefits. (Certified Administrative Record ["AR"] 203-06.) On February 6, 2014, Plaintiff also protectively filed for SSI. (AR 207-12.) In both applications, plaintiff alleged onset of disability on October 1, 2012. (AR 203-12.) Plaintiff stated that he was unable to work due to migraines, five brain surgeries, a herniated disc, a stroke, anxiety, depression, sciatica, a pinched nerve, a blood clot in right lung, and high blood pressure. (AR 153, 161.) The applications were denied initially and upon reconsideration. (AR 15, 152-58, 161-67.)

On July 10, 2014, plaintiff requested an administrative hearing. (AR 168-69.) A hearing was held before an administrative law judge ("ALJ") on September 14, 2015. (AR 35-88.) Plaintiff testified at the hearing, along with a Vocational Expert ("VE"), Connie Guillory, and a medical expert, John W. Pollard, M.D. (AR 24, 35-88.) Plaintiff was not represented at the administrative hearing. (AR 36-38.) The ALJ issued a decision on March 25, 2016, finding that plaintiff was not disabled. (AR 35-37.) Thereafter, plaintiff requested a review of the decision by the Appeals Council. (AR 199-202.) The ALJ's decision became the final decision of the Commissioner on July 13, 2017, when the Appeals Council denied plaintiff's request for review. (AR 1-6.) This timely civil action followed.

///

///

**SUMMARY OF THE ALJ'S FINDINGS**

In rendering his decision, the ALJ followed the Commissioner's five-step sequential evaluation process. *See* 20 C.F.R. §§ 404.1520, 416.920. At step one, the ALJ found that plaintiff had engaged in substantial gainful activity from September 8, 2014 through May 2015. (AR 17-18.) Specifically, plaintiff worked part-time from September 8, 2014 to May 2015 as a night auditor at a hotel, earning approximately $1,382.63 per month, which is above substantial gainful activity levels for 2014 and 2015. (AR 17-18.)

At step two, the ALJ found that plaintiff had the following severe impairments: pulmonary embolism, headaches, migraines, obesity, affective disorder, and anxiety disorder. (AR 18.)

At step three, the ALJ found that plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of one of the impairments listed in the Commissioner's Listing of Impairments. (AR 19.)

Next, the ALJ determined that plaintiff had the residual functional capacity ("RFC") to perform light work, except plaintiff: (1) must avoid hazards such as moving machinery and unprotected heights; (2) must avoid climbing ladders, ropes, or scaffolds; (3) is limited to understanding, remembering, and carrying out simple, routine, repetitive tasks with standard industry breaks every two hours; (4) is limited to no interaction with the general public; and (5) is limited to occasional work-related, non-personal, non-social interaction with co-workers and supervisors involving no more than a brief exchange of information or hand-off of product. (AR 21-27.)

At step four, the ALJ determined that plaintiff was unable to perform any past relevant work as a customer service representative, warehouse worker, or night auditor. (AR 27-28.)

The ALJ then proceeded to step five of the sequential evaluation process. Based on the VE's testimony that a hypothetical person with plaintiff's vocational profile could perform the requirements of occupations that existed in significant numbers in the national

17-cv-01582-MMA (RNB)

economy (*i.e.*, hand packer, document preparer), the ALJ found that plaintiff was not disabled from October 1, 2012 through March 25, 2016.  (AR 28-29.)

## DISPUTED ISSUES

As reflected in plaintiff's motion for summary judgment, the disputed issues that plaintiff is raising as the grounds for reversal or remand are as follows:

1.     Whether the ALJ erred when he failed to reference one of the medical opinions of record.  (ECF No. 10-1 at 17-19.)

2.     Whether the ALJ made a proper adverse credibility determination with respect to plaintiff's subjective symptom testimony.  (ECF No. 10-1 at 13-17.)

## STANDARD OF REVIEW

Under 42 U.S.C. § 405(g), this Court reviews the Commissioner's decision to determine whether the Commissioner's findings are supported by substantial evidence and whether the proper legal standards were applied.  *DeLorme v. Sullivan*, 924 F.2d 841, 846 (9th Cir. 1991).  Substantial evidence means "more than a mere scintilla" but less than a preponderance.  *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Desrosiers v. Sec'y of Health & Human Servs.*, 846 F.2d 573, 575-76 (9th Cir. 1988).  Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Richardson*, 402 U.S. at 401.  This Court must review the record as a whole and consider adverse as well as supporting evidence.  *Green v. Heckler*, 803 F.2d 528, 529-30 (9th Cir. 1986).  Where evidence is susceptible of more than one rational interpretation, the Commissioner's decision must be upheld.  *Gallant v. Heckler*, 753 F.2d 1450, 1452 (9th Cir. 1984).

///
///
///
///

**DISCUSSION**

As discussed hereafter, the Court concurs with the Commissioner that reversal is not warranted based on the ALJ's alleged failure to reference one of the medical opinions of record. However, the Court concurs with plaintiff that the ALJ failed to provide legally sufficient reasons on which he could properly rely in order to reject plaintiff's subjective symptom testimony.

**A.    Reversal is not warranted based on the ALJ's failure to reference one of the medical opinions of record.**

The law is well established in this Circuit that a treating physician's opinions are entitled to special weight because a treating physician is employed to cure and has a greater opportunity to know and observe the patient as an individual. *See McAllister v. Sullivan*, 888 F.2d 599, 602 (9th Cir. 1989). "The treating physician's opinion is not, however, necessarily conclusive as to either a physical condition or the ultimate issue of disability." *Magallanes v. Bowen*, 881 F.2d 747, 751 (9th Cir. 1989). The weight given a treating physician's opinion depends on whether it is supported by sufficient medical data and is consistent with other evidence in the record. *See* 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2). If the treating physician's opinion is uncontroverted by another doctor, it may be rejected only for "clear and convincing" reasons. *See Lester v. Chater*, 81 F.3d 821, 830 (9th Cir. 1995); *Baxter v. Sullivan*, 923 F.3d 1391, 1396 (9th Cir. 1991). Where a treating physician's opinion is controverted, it may be rejected only if the ALJ makes findings setting forth specific and legitimate reasons that are based on the substantial evidence of record. *See*, *e.g.*, *Reddick v. Chater*, 157 F.3d 715, 725 (9th Cir. 1998) ("A treating physician's opinion on disability, even if controverted, can be rejected only with specific and legitimate reasons supported by substantial evidence in the record."); *Magallanes*, 881 F.2d at 751; *Winans v. Bowen*, 853 F.2d 643, 647 (9th Cir. 1987).

Plaintiff contends that the ALJ erred when he failed to "even reference the [treating physician's] opinion contained in the Mental Impairment Questionnaire at TR 675-679."

5

(ECF No. 10-1 at 18.)  As such, he asserts that "the ALJ did not even attempt to meet his burden" in rejecting the opinion.  (*Id.* at 19.)  In fact, as the Commissioner points out, the ALJ did consider and address this opinion, giving it little weight.  (*See* AR 26; ECF No. 11-1 at 23-24.)  The Court deems plaintiff's failure to address the Commissioner's response in his reply as a concession that this disputed issue has no merit.  (*See* ECF Nos. 13, 14.)

**B.**      **The Court is unable to affirm the ALJ's adverse credibility determination.**

In deciding whether to accept a claimant's subjective symptom testimony, an ALJ must perform two stages of analysis.  *Vasquez v. Astrue,* 572 F.3d 586, 591 (9th Cir. 2009).  First, the claimant must produce objective medical evidence of an impairment or impairments and show that the impairment or combination of impairments could reasonably be expected to produce some degree of the symptoms described.  *Id.* (citing *Lingenfelter v. Astrue,* 504 F.3d 1028, 1036 (9th Cir. 2007)).  Second, if the claimant has presented such evidence and there is no evidence of malingering, the ALJ can reject the claimant's testimony about the severity of her symptoms only by offering specific, clear and convincing reasons for doing so.  *Vasquez,* 572 F.3d at 591 (citing *Lingenfelter*, 504 F.3d at 1036)); *see also Bunnell v. Sullivan*, 947 F.2d 341, 345 (9th Cir. 1991) ("[O]nce the claimant produces objective medical evidence of an underlying impairment, an adjudicator may not reject a claimant's subjective complaints based solely on a lack of objective medical evidence to fully corroborate the alleged severity of pain.").  The ALJ must state specifically which symptom testimony is not credible and what facts in the record support that conclusion.  *Dodrill v. Shalala*, 12 F.3d 915, 918 (9th Cir. 1993).

Here, since the ALJ did not cite evidence of malingering and the Commissioner has not argued that there was evidence of malingering,[2] the Court will apply the "clear and

---

[2]     (*See* ECF No. 10-1 at 15; ECF No. 11-1 at 8-19.)

convincing" standard to the ALJ's adverse credibility determination. *See Burrell v. Colvin*, 775 F.3d 1133, 1136 (9th Cir. 2014) (applying "clear and convincing" standard where the government did not argue that a lesser standard should apply based on evidence of malingering); *see also Ghanim v. Colvin*, 763 F.3d 1154, 1163 n.9 (9th Cir. 2014) (same).

Plaintiff alleged that he could not work because of migraines, five brain surgeries, a herniated disc, a stroke, anxiety, depression, sciatica, a pinched nerve, a blood clot in right lung, and high blood pressure. (AR 153, 161.) During the administrative hearing, plaintiff testified that he could not work because of headaches, dizziness, cognitive problems, and problems concentrating. (AR 67.) Plaintiff had a brain tumor removed in 1991, which did not recur. (AR 54.) He also had a shunt put in his head in 1992 to prevent hydrocephalus. (AR 54, 68.)

Plaintiff testified that he experienced "really bad" headaches, which reached a 9 on a pain scale of 1-10, for at least a year prior to the hearing. (AR 49, 68-71.) He further testified that despite medication, they had become "unmanageable." (AR 49, 68-69.) He testified that his doctors had determined that he had calcification and scar tissue related to his shunt which was causing the headaches. (AR 49.) He testified that his doctors were trying to manage the headaches, but were unable to do so, and in the four to six weeks prior to the hearing, plaintiff stopped being able to drive, and had maybe two good days out of a seven-day period where he was not in bed in pain. (AR 49, 61-62.) Plaintiff further testified that his surgeon had previously removed scar tissue from his neck (in approximately 2008), and had informed him that in three to five years, he was going to need surgery again because of calcification related to the shunt. (AR 67.)

Plaintiff testified that when he would have a headache, he could not go anywhere (*e.g.*, the store). (AR 68.) He testified that he was in bed all day with ice packs and heat packs. (AR 68.) The pain was located in the back of his neck and radiated up towards his occipital nerve and then to his frontal lobe. (AR 68.) Plaintiff also testified that he would get dizzy when he stood up, and that he had to wait until the room stopped spinning before he could try walking. (AR 76.)

Plaintiff testified that he was fired from his part-time job as a night auditor at the Legoland Hotel in May 2015 because he missed too much work due to his headaches.[3] (AR 62-64, 69.)  Plaintiff further testified that he was fired from his job as a customer service representative at Sempra Energy in October 2012 because he had too many absences related to his own health problems, and his wife's health problems.  (AR 64-65.)

Plaintiff testified that in the summer of 2014 he had to un-enroll in a master's program for education at the University of Phoenix, because he was in bed in so much pain. (AR 71, 73.)  Prior to that, he had been in the program for almost a full year, on a full-time basis, taking exclusively online classes.  (AR 71-72.)  Plaintiff testified that he spent 30-40 hours a week on the program, and "also had to go to schools and do in-house observing." (AR 72.)  However, he also testified that he was only able to observe about four hours before he had to un-enroll.  (AR 73.)  Plaintiff planned on taking some time off and going back, but he was not able to do so because he did not have the stamina to sit at a computer to read and answer questions.  (AR 74.)

Plaintiff testified that after he stopped working in May 2015, he "pretty much" spent his days in bed.  (AR 74.)  He testified that it took too much out of him to go to the gym for some cardio, and that he had gained approximately fourteen pounds in the prior year. (AR 74.)  Plaintiff testified that he did not really do any chores around the house or partake in any kind of leisure activities.  (AR 75.)  Plaintiff's wife took care of him and did whatever chores needed to be done.  (AR 75.)

Plaintiff further testified that when he got ready to take his California teaching tests, that was when he figured out that his cognitive skills, despite being an A/B student, were "just horrible" and that he was not retaining anything.  (AR 72.)  He testified that he worked

---

[3]   Plaintiff testified that he was terminated while in the hospital because he was missing too much work.  (AR 64.)  He further testified that after he provided human resources with documentation of his doctor visits and ambulance rides, he was offered to stay in the position, but because he was so sick, he felt like the issue would continue and turned down the offer.  (AR 64.)

on his cognitive skills, but he was constantly losing stuff. (AR 76.) He testified that he had a handicap placard because otherwise he would spend hours looking for his car. (AR 76.)

Plaintiff also testified that he received numerous treatments for his headaches, including: (1) Botox injections (four); (2) epidural injections (eight or nine); (3) H-wave stimulation treatment; (4) IV with fluids and Dilaudid; and (5) Oxy. (AR 69, 77-79.) Plaintiff further testified that he had an MRI yearly. (AR 79.)

Dr. Pollard, who appeared by telephone, testified that plaintiff was very convincing in his testimony, and that he did not see any inconsistencies between plaintiff's testimony and his medical records. (AR 81-82.) At the time of the hearing, however, Dr. Pollard did not have, and therefore had not reviewed, plaintiff's more recent medical records from Kaiser and Palomar Medical Center. (AR 34, 48-53.) The most recent records he reviewed from Kaiser were from June 2014, and the most recent records he reviewed from Palomar Medical Center were from February 2014. (AR 40-41.)

The ALJ determined that although plaintiff's medically determinable impairments could reasonably be expected to cause the alleged symptoms, plaintiff's statements concerning the intensity, persistence, and limiting effects of these symptoms were not entirely credible to the extent they were inconsistent with the ALJ's RFC determination for light work. (*See* AR 21-27.) In support of this adverse credibility determination, the ALJ proffered the following reasons: (1) "despite [plaintiff's] allegations of constant headaches and neck pain, [plaintiff] worked and engaged in substantial gainful activity from September 2014 to May 2015"; (2) plaintiff "received unemployment insurance benefits during the relevant period at issue" which required him to "certify that he was willing and able to engage in work activity, which is inconsistent with a claim for disability"; (3) plaintiff's "symptoms were relatively controlled under the prescribed treatment regimen"; (4) plaintiff demonstrated an ability to focus and concentrate at the hearing, where he "was articulate and provided specific information regarding his work history, medical history, and personal history"; and (5) "some of [plaintiff's] statements regarding the limiting

effects of his physical impairments were inconsistent with activities of daily living," including: (a) exercising 30 minutes a day, six days a week, at a moderate or strenuous level in July 2014; (b) being enrolled in a full time master's degree program from summer 2013 to July 2014, on which he spent 30-40 hours per week, including classroom observations, and received mostly A's and B's; and (c) engaging in heavy lifting in November 2014. (AR 22.)

The ALJ further found that the medical evidence in the record did not support the degree of limitations alleged by plaintiff. (AR 23.) The ALJ's opinion contains a lengthy discussion of plaintiff's medical records. (*See* AR 23-27.) In his discussion, the ALJ noted that that "[i]t does not appear that [plaintiff] has had any emergency treatment or hospitalizations for his headaches since April 2015," and his outpatient records indicated "unremarkable findings" in July 2015. (AR 24.) The ALJ added that there was no evidence of shunt infection or malfunctioning, and that plaintiff's medical records indicated his symptoms were "relatively controlled under the prescribed treatment regimen." (AR 23-24.) The ALJ further noted that although plaintiff's medical records indicated emergency treatment for headaches (as well as chest pain and/or shortness of breath, depression and anxiety) prior to May 2015, plaintiff was either attending graduate school and/or engaging in substantial gainful activity during that period. (AR 23-25.)

In his motion, plaintiff contends that the ALJ failed to make adequate specific findings stating clear and convincing reasons for rejecting plaintiff's testimony regarding the severity of his symptoms, because he primarily relied on plaintiff's statements regarding physical activity over a year prior to the hearing, which took place on September 14, 2015. (ECF No. 10-1 at 16-17.) Plaintiff notes that he un-enrolled in his master's program in July 2014, and the last progress notes regarding his exercise regimen were also in July 2014. (*See id.* at 17, n.4.) Plaintiff claims that this "rationale cannot be held to be substantial evidence given its age." (*See id.* at 17.) Plaintiff further contends that his testimony regarding his master's program and physician-ordered exercise regimen did not demonstrate that he had engaged in daily activities that were easily transferrable to a work

17-cv-01582-MMA (RNB)

environment, where it might be impossible to rest periodically or take medication. (*See id.* at 14.) In his reply, plaintiff also contends that the ALJ did not adequately address his testimony that his daily activities had been modified significantly over the course of the prior year, particularly due to his headaches, and that he was spending five days a week in bed in pain and was dizzy when he stood up. (ECF No. 14 at 3.)

As set forth below, the Court finds that none of the reasons proffered by the ALJ in support of his adverse credibility finding constituted a legally sufficient reason.

1. Plaintiff engaged in substantial gainful activity from September 2014 to May 2015

One of the reasons proffered by the ALJ for rejecting plaintiff's subjective symptom testimony was that "despite [plaintiff's] allegations of constant headaches and neck pain, [plaintiff] worked and engaged in substantial gainful activity from September 2014 to May 2015." (AR 22.)

Plaintiff filed applications on December 19, 2013 and February 6, 2014 for a period of disability and disability insurance benefits and SSI benefits, alleging onset of disability on October 1, 2012. (AR 203-12.) After the alleged onset of disability date, as noted by the ALJ, plaintiff worked "part-time from September 8, 2014 to May 2015, as a night auditor at a hotel." (AR 17.) The ALJ further noted that plaintiff "earned $14.00 per hour and worked 16-20 hours a week." (AR 17.) Plaintiff testified that he started working again because he "needed to bring some money in somehow." (AR 66.) Plaintiff further testified that he was fired from the hotel in May 2015 because he missed too much work due to his headaches. (AR 62-64, 69.)

An ALJ is permitted to consider a claimant's attempts to work or substantial gainful activity in determining his credibility. *See*, *e.g.*, *Lingenfelter*, 504 F.3d at 1036. However, this "reason in and of itself . . . is not a sufficient basis for the ALJ's adverse credibility finding." *Id.* at 1033 (finding the reason insufficient where the claimant worked for nine weeks after filing an application for disability insurance benefits and SSI benefits). Where,

as here, the claimant, "after the relevant time period during which he claimed to be disabled and facing difficult economic circumstances, tried to work . . . and, because of his impairments, failed," it "is not a clear and convincing reason for concluding that his symptoms could not have precluded him from maintaining employment during the relevant time period." *Id.* at 1036-37, 38-39 (noting the Ninth Circuit has "suggested that similar evidence that a claimant tried to work and failed actually *supported* his allegations of disabling pain" and that the "Social Security Administration permits recipients of disability benefits to work on a trial basis without the trial work period adversely affecting their disability status").

Accordingly, the Court finds that plaintiff's period of part-time work after the alleged onset of disability did not constitute a legally sufficient reason on which the ALJ could properly rely in support of his adverse credibility determination.

### 2. Plaintiff received unemployment benefits

Another reason proffered by the ALJ was that plaintiff "received unemployment insurance benefits during the relevant period at issue" which required him to "certify that he was willing and able to engage in work activity, which is inconsistent with a claim for disability." (AR 22.) The ALJ specifically noted that the record "indicates [plaintiff] received such benefits in the second quarter of 2013, third quarter of 2013, fourth quarter of 2013, and third quarter of 2015. (AR 22.)

A claimant's receipt of unemployment benefits could be a legally sufficient reason to find a claimant not credible if it evidenced that the claimant considered himself capable of work and held himself out as available for work. *See Copeland v. Bowen*, 861 F.2d 536, 542 (9th Cir. 1988). However, a claimant's receipt of unemployment benefits does not preclude receipt of Social Security benefits: for example, a person capable of only part-time work may receive benefits under both programs. Compare Cal. Unemp. Ins. Code § 1253.8 (an individual shall not be disqualified from unemployment benefits solely on the basis that he is only available for part-time work); with 20 C.F.R. § 404.1545(b) (claimant

under the Social Security Act is assessed for his capacity to work "on a regular and continuing basis"); and Social Security Ruling ("SSR") 96–8p, 1996 WL 374184, at *2 (defining "a regular and continuing basis" as "8 hours a day, for 5 days a week, or an equivalent work schedule").  Accordingly, a claimant's receipt of unemployment benefits does not necessarily constitute a legally sufficient reason for an adverse credibility determination when the record "does not establish whether [the claimant] held himself out as available for full-time or part-time work."  *See Carmickle v. Comm'r, Soc. Sec. Admin.*, 533 F.3d 1155, 1161-62 (9th Cir. 2008); *see also Giuliano v. Colvin*, 577 F. App'x. 859, 865 (10th Cir. 2014) (noting that claimant who was receiving unemployment benefits was also looking for part-time work, which may not have been inconsistent with allegations of total disability under the Social Security Act); *Mulanax v. Comm'r of Soc. Sec.*, 293 F. App'x. 522, 523 (9th Cir. 2008) (receipt of unemployment benefits that were payable to applicants available for temporary or part-time jobs was not necessarily inconsistent with a claim of disability under the Social Security Act).

Here, although the record does contain evidence that plaintiff received unemployment benefits for three quarters in 2013 and one quarter in 2015, the record does not provide any context for that evidence.  (*See* AR 22, Exhibits 6D, 8D.)  The record does not contain plaintiff's unemployment benefits application, does not specify whether plaintiff claimed he was available for full-time or part-time work, and does not otherwise specify the basis for any application for unemployment benefits.  Moreover, as noted above, after the alleged onset of disability date, plaintiff's only employment was part-time.

Accordingly, the Court finds that the evidence in the record that plaintiff received unemployment benefits did not give rise to a legally sufficient reason on which the ALJ could properly rely in support of his adverse credibility determination.  *See*, *e.g.*, *Plummer v. Colvin*, No. CV-13-08282-PCT-BSB, 2014 WL 7150682, at *16 (D. Az. Dec. 16, 2014) (claimant's receipt of unemployment benefits was not clear and convincing reason for ALJ's adverse credibility determination where the record did not contain the unemployment benefits application nor establish the manner in which claimant held herself

out as available for work in completing any such application); *Wood v. Colvin*, No. 2:13-CV-00190-JTR, 2014 WL 4407719, at *9 (E.D. Wash. Sept. 8, 2014) (same where record contained no certification by claimant that he was physically and mentally able to work full-time); *Miller v. Colvin*, No. CV 13-1259-E, 2014 WL 1873276, at *4 (C.D. Cal. May 9, 2014) (same where there was no indication whether claimant based her claim for unemployment benefits on full-time or part-time work); *Ellis v. Astrue*, No. CV-10-6253-HZ, 2011 WL 5025839, at *5-6 (D. Or. Oct. 20, 2011) (same where record did not contain claimant's unemployment benefits application).

### 3. Plaintiff's symptoms were relatively controlled under the prescribed treatment regimen

Another reason proffered by the ALJ was that plaintiff's "symptoms were relatively controlled under the prescribed treatment regimen." (AR 22.) With regard to plaintiff's headaches, the ALJ relied on the fact that although plaintiff received emergency treatment for his headaches and neck pain in 2013, 2014, and 2015, including a hospitalization in April 2015, as well as epidural injections, Botox injections, and used an H-wave unit, he "was attending school or working at the time of these visits and hospitalization." (AR 23-24.) The ALJ also noted that a review of systems from July 2015 revealed "unremarkable findings" and that it did not appear that plaintiff had received any emergency treatment or hospitalizations for his headaches since April 2015. (AR 24.) Thus, the ALJ concluded that "[d]espite some emergency treatment and receiving various injections, [plaintiff's] symptoms have been relatively controlled under the treatment regimen." (AR 24.) The ALJ added that it was "telling[]" that plaintiff was able to work and attend school despite his treatment, and "notabl[e]" that plaintiff only missed six days of work at the hotel during this period. (AR 24.)

Evidence that treatment can effectively control an impairment may be a clear and convincing reason to find a claimant less credible. *See* 20 C.F.R. §§ 404.1529(c)(3)(iv), 416.929(c)(3)(iv); *Warre v. Comm'r of Soc. Sec. Admin.*, 439 F.3d 1001, 1006 (9th Cir.

2006) (stating that "[i]mpairments that can be controlled effectively with medication are not disabling for purposes of determining eligibility for SSI benefits.").

Here, however, substantial evidence in the record does not support the ALJ's conclusion. Plaintiff's treatment records reflect that plaintiff consistently complained of chronic severe headaches that were unmanageable and often described as disabling. *See Lankford v. Astrue*, No. 1:12-cv-01517-NJV, 2013 WL 416221, at *5 (N.D. Cal. Jan. 31, 2013) (concluding that the ALJ's finding that a claimant's pain was controlled did not support his credibility assessment because the ALJ failed to recognize that the medication did not resolve the problem and claimant continued to complain of chronic pain); *see also* AR 18 (ALJ noting that the "claimant complained of headaches throughout the relevant period.").

At the ALJ hearing, Dr. Pollard testified that plaintiff was very convincing in his testimony, and that he did not see any inconsistencies between plaintiff's testimony and his medical records. (AR 81-82.) In summarizing the record, Dr. Pollard testified that plaintiff's primary symptoms were a headache and neck pain, cognitive changes, depression, anxiety, and panic attacks. (AR 53.) He further testified that "[m]ultiple treatments have not been helpful." (AR 54.)

At the time of the hearing, however, Dr. Pollard did not have, and therefore had not reviewed, plaintiff's more recent medical records from Kaiser and Palomar Medical Center. (AR 34, 48-53.) The most recent records he reviewed from Kaiser were from June 2014, and the most recent records he reviewed from Palomar Medical Center were from February 2014. (AR 40-41.) He had not reviewed plaintiff's exhibits 11F through 13F. (*See* AR 52.) The ALJ purported to consider the subsequent records in his decision. (*See* AR 22-27.)

The late-obtained treatment notes not reviewed by Dr. Pollard indicate that plaintiff continued to have chronic severe headaches throughout 2014 and into at least August 2015. (*See* AR 779, 798-802, 804-06, 810-11, 836, 872, 892, 909-11.) According to plaintiff's

evaluations, the immediate cause of the headaches was not clear, but he continued to receive treatment for them.  (*See, e.g.,* AR 846-52, 911.)

In January 2015, plaintiff went to the emergency room because he was experiencing daily headaches, which were not responding to treatment, but that morning he woke up with a more severe headache than normal, along with dizziness.  (AR 909, 922.)  Treatment notes beginning in February 2015 also indicated plaintiff was receiving epidural cortisone injections to the C4-C5 area.  (AR 832-34, 841-42.)  Plaintiff reported having "much success" with the injections, but also reported that all injections were "helpful for short term none for long term."  (AR 832-34, 841-42.)  At the same time he sought treatment in February 2015, he reported his pain to be a 7/8 out of 10, with his worst pain level in the last two weeks reaching a 10/10.  (AR 832, 836.)

In April 2015, when plaintiff discussed a cervical epidural steroid injection with his physician at Kaiser, the physician noted that given the "absence of cervical radiculitis and minimal findings on mri," the "expectation of benefit of epidural injection is low when current etiology of pain sx unclear."  (AR 847.)  The physician further noted that at the C4-5 area plaintiff had "no significant disk bulge," "no canal stenosis," "unremarkable" facet joints, and "no neural foraminal stenosis."  (AR 846.)  However, plaintiff thereafter received a cervical epidural steroid injection for his neck pain on April 20, 2015.  (AR 850.)  There was a "reduction" of neck pain after the procedure.  (AR 852.)

The following day, however, plaintiff went to the emergency room with a different type of headache and neck pain in the region of his shunt, and numbness in his left upper extremity.  (AR 856-58.)  Plaintiff's CT and shunt series appeared normal, but he was admitted for pain control.  (AR 863-69.)  During a neurosurgery consult the next day, a physician noted that plaintiff's shunt was "non-functional" and had been so for at least the past year.  (AR 871.)  A different physician noted that the new "head ache and neck pain exacerbation" were of undetermined origin, and there was "[n]o evidence of shunt infection or malfunction; in fact the shunt may be chronically non-functioning based on its CT appearance."  (AR 874.)  The following day, plaintiff's headache was overall better, but he

17-cv-01582-MMA (RNB)

still needed an IV, and a physician stated that plaintiff required inpatient care to be safely and appropriately treated.  (AR 879.)

In June 2015, plaintiff reported to his physicians that he was not functional about four days a week because of headaches, and was hoping to see chronic pain management for possible acupuncture.  (AR 892.)  Plaintiff's physician thought acupuncture would be a good option, but it was not covered by plaintiff's insurance.  (AR 901.)  In July 2015, plaintiff reported getting disabling headaches three to four days per week, and sought a re-referral back to chronic pain management.  (AR 896.)  In August 2015, plaintiff reported that he was "struggling with a wean off of his pain medications," and was having to spend more time in bed.  (AR 899.)  Plaintiff was attempting to decrease his reliance on Percocet, one of his pain medications.  (*See* AR 901.)

As of July 2015, the final patient record, there was no indication plaintiff's chronic severe headaches had subsided or were being controlled by medication and/or treatment.  As of July 28, 2015, plaintiff was noted to be taking the following medication: Lioresal for pain, Percocet for pain, Xanax, Prinzide/Zestoretic for blood pressure, Keppra, Flexeril for muscle spasms, Naprosyn for pain, Buspar, Cymbalta, and Desyrel.  (*See* AR 901-02.)

Based on the foregoing, the Court finds that the ALJ's determination that plaintiff's symptoms were relatively controlled under the prescribed treatment regimen was not supported by the medical record as a whole.  *See generally Ghanim*, 763 F.3d at 1161-62 (an ALJ's consideration of the medical evidence must include the "context of the overall diagnostic picture" or the medical record on the whole).  Therefore, the Court finds that this also was not a legally sufficient reason on which the ALJ could properly rely in support of his adverse credibility determination.

### 4.  Plaintiff demonstrated an ability to focus and concentrate at the hearing

Another reason proffered by the ALJ was that plaintiff demonstrated an ability to focus and concentrate at the hearing, where he "was articulate and provided specific information regarding his work history, medical history, and personal history."  (AR 22.)

An ALJ may "consider his or her own recorded observations of the individual as part of the overall evaluation of the credibility of the individual's statements." SSR 96-7p, 1996 WL 374186, at *5; *but see Orn v. Astrue*, 495 F.3d 625, 639-40 (9th Cir. 2007) ("The ALJ's observations of a claimant's functioning may not form the sole basis for discrediting a person's testimony."). However, while this observation relates, at least tangentially, to plaintiff's complaints of cognitive problems (*e.g.*, lack of retention, misplacing items, and forgetting where he parked his car) and problems concentrating, it does not relate to plaintiff's testimony regarding his chronic severe headaches. Accordingly, the Court finds that this "reason" did not constitute a legally sufficient reason on which the ALJ could properly rely to reject plaintiff's subjective symptom testimony regarding the pain severity of his headaches.

### 5. Inconsistent with activities of daily living

An additional reason proffered by the ALJ was that "some of [plaintiff's] statements regarding the limiting effects of his physical impairments were inconsistent with activities of daily living," including: (a) exercising 30 minutes a day, six days a week, at a moderate or strenuous level in July 2014; (b) being enrolled in a full time master's degree program from summer 2013 to July 2014, on which he spent 30-40 hours per week, including classroom observations, and received mostly A's and B's; and (c) engaging in heavy lifting in November 2014. (AR 22.)

Engaging in daily activities that are incompatible with the severity of symptoms alleged can support an adverse credibility determination. *See Orn*, 495 F.3d at 639; *Batson v. Comm'r of Soc. Sec. Admin.*, 359 F.3d 1190, 1196 (9th Cir. 2004). Daily activities may also be "grounds for an adverse credibility finding 'if a claimant is able to spend a substantial part of his day engaged in pursuits involving the performance of physical functions that are transferable to a work setting.'" *Orn*, 495 F.3d at 639 (quoting *Fair v. Bowen*, 885 F.2d 597, 603 (9th Cir.1989)); *see also Smolen v. Chater*, 80 F.3d 1273, 1284

18

17-cv-01582-MMA (RNB)

n. 7 (9th Cir. 1996) (recognizing that "many home activities may not be easily transferrable to a work environment").

### a. *Exercise*

In finding that plaintiff's statements regarding the limiting effect of his physical impairments were inconsistent with his activities of daily living, the ALJ cited progress notes from July 2014 indicating that plaintiff exercised 30 minutes a day, six days per week at moderate or strenuous level. (AR 22.)

In December 2014, plaintiff's treatment notes indicate plaintiff had been exercising on his physician's orders, but stopped with low back pain. (*See* AR 824, 827, 832, 836, 884, 892, 894.) They also indicate plaintiff reported that his neck and head pain was worse with light activity. (*See* AR 842, 899.) There is no indication in the notes that he started exercising again. (*See* AR 824, 827, 832, 836, 884, 892, 894.) During the hearing, plaintiff testified that he had been experiencing "really bad" headaches for at least a year prior to the hearing, and since he stopped working in May 2015, he "pretty much" spent his days in bed. (AR 49, 68-71, 74.) He further testified that he had been unable to go to the gym and had gained approximately fourteen pounds in the past year as a result. (AR 74.)

Based on the foregoing, it appears that plaintiff's daily exercising for a brief period of time more than a year prior to the hearing is not inconsistent with his pain testimony concerning his chronic severe headaches. Therefore, the Court finds that this was not a legally sufficient reason on which the ALJ could properly rely in support of his adverse credibility determination.

### b. *Engaged in heavy lifting in November 2014*

The ALJ also cited the fact that plaintiff engaged in heavy lifting in November 2014 as a reason to find plaintiff's statements regarding the limiting effect of his physical impairments to be inconsistent with his activities of daily living. (AR 22.) The ALJ cited a medical progress note that stated plaintiff complained of sharp chest pains after "recent

19

heavy lifting after moving." (AR 820-21.)  Although this activity may be inconsistent with certain physical ailments plaintiff did not testify about, the Court finds that this was not a legally sufficient reason on which the ALJ could properly rely in support of his adverse credibility determination.

### c.  *Enrolled in full-time degree program*

The ALJ further cited the fact that plaintiff was enrolled in a full-time master's degree program from summer 2013 until July 2014, and received mostly A's and B's, as a reason for finding plaintiff's statements regarding the limiting effect of his physical impairments to be inconsistent with his daily activities.  (AR 22.)  The ALJ added that "[i]n this program, [plaintiff] was also spending 30-40 hours per week on education-related activities, including classroom observations."  (AR 22.)

The Court finds that, based on the record before it, plaintiff's participation in his master's degree program does not appear to be inconsistent with his subjective pain testimony.  As the ALJ noted, plaintiff's master's degree program was exclusively online, and plaintiff does not claim that he was unable to function 24/7 from summer 2013 until July 2014.  Moreover, plaintiff testified that he was only able to observe about four hours before he had to un-enroll from his program in July 2014, because his headaches were getting progressively worse.  (AR 72-73.)  He stated that it got to the point where he "couldn't do the work, the schoolwork, the hours that were needed to be in observing and I couldn't do any of that because I was, again, in bed in pain."  (AR 73.)  Plaintiff further testified that in the period leading up to the hearing, he was bedridden most of the week. (AR 49, 61-62.)  Plaintiff was also never able to return to school.  (AR 74.)

Based on the foregoing, the Court finds that plaintiff's participation in his master's degree program did not give rise to a legally sufficient reason on which the ALJ could properly rely to reject plaintiff's subjective symptom testimony regarding the pain severity of his headaches.

///

17-cv-01582-MMA (RNB)

### 6. Unsupported by objective medical evidence

The sole remaining reason proffered by the ALJ was that plaintiff's subjective symptom complaints were unsupported by the objective medical evidence, citing the same reasons set forth above: (1) it does not appear that plaintiff has had any emergency treatment or hospitalizations for his headaches since April 2015; and (2) plaintiff's symptoms have been relatively controlled under the prescribed treatment regimen, noting that plaintiff was able to work and attend school. (*See* AR 23-24.) However, since the ALJ's other reasons were legally insufficient to support his adverse credibility determination, this remaining reason cannot be legally sufficient by itself. *See Robbins v. Soc. Sec. Admin.*, 466 F.3d 880, 884 (9th Cir. 2006) (where ALJ's initial reason for adverse credibility determination was legally insufficient, his sole remaining reason premised on lack of medical support for claimant's testimony was legally insufficient); *Light v. Soc. Sec. Admin.*, 119 F.3d 789, 792 (9th Cir. 1997) ("[A] finding that the claimant lacks credibility cannot be premised wholly on a lack of medical support for the severity of his pain.").

### 7. Harmless Error

The Commissioner argues that plaintiff has not shown how any alleged error was harmful because, although the ALJ discounted plaintiff's symptom allegations, he nonetheless included limitations in plaintiff's RFC[4] that accommodated his subjective complaints. (ECF No. 11-1 at 20.) The Court is mindful that harmless error principles apply in social security cases. *See Molina v. Astrue*, 674 F.3d 1104, 1115 (9th Cir. 2012) ("We have long recognized that harmless error principles apply in the Social Security Act context."). However, plaintiff testified, *inter alia*, that his condition had deteriorated in the year prior to the hearing and that he had maybe two good days out of a seven-day period

---

[4] A claimant's RFC is what a claimant can still do despite his limitations. *See Smolen*, 80 F.3d at 1291.

where he was not bedridden in pain. (AR 49, 61-62.) The ALJ did not accommodate this subjective symptom testimony in his RFC determination. The Court therefore finds that the ALJ's failure to make a proper adverse credibility determination was not harmless error.

## CONCLUSION AND RECOMMENDATION

For the foregoing reasons, this Court **RECOMMENDS** that plaintiff's motion for summary judgment be **GRANTED,** that the Commissioner's cross-motion for summary judgment be **DENIED**, and that Judgment be entered reversing the decision of the Commissioner and remanding this matter for further administrative proceedings.

Any party having objections to the Court's proposed findings and recommendations shall serve and file specific written objections within 14 days after being served with a copy of this Report and Recommendation. *See* Fed. R. Civ. P. 72(b)(2). The objections should be captioned "Objections to Report and Recommendation." A party may respond to the other party's objections within 14 days after being served with a copy of the objections. *See id*.

IT IS SO ORDERED.

Dated: June 18, 2018

_____
ROBERT N. BLOCK
UNITED STATES MAGISTRATE JUDGE